UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| TIMOTHY SIMMONS, | ) |
| Plaintiff, | ) ) ) |
| | ) No. 16 C 4501 |
| v. | ) ) Chief Judge Rubén Castillo |
| S.A. GODINEZ, et al., | ) ) |
| Defendants. | ) |

## MEMORANDUM OPINION AND ORDER

Timothy Simmons ("Plaintiff") brings this action under 42 U.S.C. § 1983 against S.A. Godinez ("Godinez"), Director of Illinois Department of Corrections; Tarry Williams ("Williams"), Warden of Stateville Correctional Center; Dr. Saleh Obaisi ("Dr. Obaisi"), Medical Director of Stateville Correctional Center; Wexford Health Sources, Inc. ("Wexford"); and the Illinois Department of Corrections ("IDOC"). (R. 43, Second Am. Compl.) Before the Court are Wexford's and IDOC's separate motions to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6). (R. 46, Mot.; R. 53, Mot.) For the reasons stated below, Defendants' motions are denied.

## RELEVANT FACTS

Plaintiff has been incarcerated within IDOC since 2007 and was held in Stateville Correctional Facility ("Stateville") between September 2009 and September 2015. (R. 43, Second Am. Compl. ¶ 17.) At all relevant times, Godinez was the Director of IDOC, Williams was the Warden of Stateville, Dr. Obaisi was the Medical Director at Stateville and employed by Wexford, and Wexford provided healthcare services to IDOC inmates. (*Id.* ¶¶ 5-9.) During his time at Stateville, Plaintiff alleges that he was made to use a top bunk and that he was only able

1

to get into and out of his bunk by climbing on top of a sink, as he was not provided a ladder. (*Id.* ¶¶ 18, 23.) Stateville did not assign bunks and inmates had no right to bottom bunks unless they received a low-bunk pass from Stateville's Health Care Unit. (*Id.* ¶¶ 19-20.)

Plaintiff alleges that on October 1, 2013, he slipped and fell on his back while attempting to climb out of his bunk. (*Id.* ¶ 24.) Plaintiff sought medical care and was seen by Dr. Obaisi two days later. (*Id.* ¶ 26.) From October 2013 to September 2015, Plaintiff allegedly experienced "mobility-limiting" back pain due to the fall. (*Id.* ¶ 28.) During that period, Plaintiff claims that he requested medical treatment from IDOC and Wexford at least 22 times and was seen by Dr. Obaisi at least ten times. (*Id.* ¶¶ 29-30.)

Plaintiff alleges that his back pain interfered with his ability to climb into and out of his top bunk. (*Id.* ¶ 35.) Plaintiff alleges that he requested, on multiple occasions, a low bunk pass from Dr. Obaisi, Williams, Wexford, and Godinez, or an assistive device from Dr. Obaisi, IDOC, Wexford, and Williams. (*Id.* ¶¶ 31-32.) These requests were denied by Defendants. (*Id.* ¶¶ 33-34.) Due to his inability to climb into his top bunk, Plaintiff alleges that he slept on the floor on multiple occasions. (*Id.* ¶ 35.) Plaintiff also alleges that he requested other treatments and referrals from Dr. Obaisi and Wexford. (*Id.* ¶ 36.) These requests were denied; Dr. Obaisi and Williams allegedly told Plaintiff that another doctor would not be paid "to do a job they were already doing." (*Id.* ¶¶ 38-39.) Despite his multiple requests for further treatment, Plaintiff alleges that he received a single X-ray for his back injury on November 14, 2013. (*Id.* ¶ 37.)

Plaintiff complained to Williams and Dr. Obaisi in person, and to Godinez through a letter. (*Id.* ¶ 40.) Between October 2013 and September 2015, Plaintiff filed five grievances regarding Defendants' failure to provide adequate care or accommodation. (*Id.* ¶ 46.) Four of the

grievances were denied on March 18, 2015. (*Id.*) After Plaintiff was transferred out of Stateville, he received an MRI on November 4, 2015, that revealed two bulging discs. (*Id.* ¶ 43.)

## PROCEDURAL HISTORY

Plaintiff filed an initial *pro se* complaint on April 20, 2016. (R. 1, Compl.) This Court granted Plaintiff leave to proceed *in forma pauperis* and appointed counsel. (R. 6, Order.) Now represented, Plaintiff filed his first amended complaint against Dr. Obaisi, Godinez, Williams, IDOC, and Wexford on October 31, 2016. (R. 20, First Am. Compl.) Wexford and Dr. Obaisi filed a joint motion to dismiss pursuant to Rule 12(b)(6) on February 14, 2017. (R. 36, Mot.) This Court granted Plaintiff leave to amend his complaint and denied Defendants' motion to dismiss as moot. (R. 41, Min. Entry)

On March 21, 2017, Plaintiff filed his second amended complaint. (R. 43, Second Am. Compl.) In Count I, Plaintiff alleges that Godinez, Williams, and Dr. Obaisi exhibited deliberate indifference to his medical needs. (*Id.* ¶¶ 47-57.) In Count II, Plaintiff alleges that Wexford's "cost-cutting measures" violated his constitutional rights. (*Id.* ¶¶ 58-62.) In Counts III and IV, Plaintiff alleges that Wexford and IDOC denied him reasonable accommodations in violation of the Americans with Disabilities Act ("ADA") and the Rehabilitation Act. (*Id.* ¶¶ 63-86.) Dr. Obaisi filed an answer on April 13, 2017, and Williams and Godinez answered on April 19, 2017. (R. 48, Answer; R. 55, Answer.)

On April 12, 2017, Wexford filed its present motion to dismiss Counts II, III, and IV it for failure to state a claim. (R. 46, Mot.) First, Wexford argues that Plaintiff's second amended complaint does not identify an express policy or a widespread practice that deprived him of his constitutional rights. (R. 47, Mem. at 5.) Second, Wexford argues that "[a] defendant does not violate the ADA and the Rehabilitation Act by simply failing to attend to the medical needs of its

3

disabled prisoners." (*Id.* at 8 (citation and internal quotation marks omitted).) Instead, they suggest, Plaintiff must allege "that he was treated worse than other inmates because he is disabled" in order to sustain an ADA and Rehabilitation Act claim. (*Id.*) On April 19, 2017, IDOC also filed a motion to dismiss Counts III and IV, arguing that the ADA and Rehabilitation Act do not apply to an inmate's ability to sleep in his bunk. (R. 54, Mem. at 4.)

Plaintiff responded to Wexford and IDOC's motions on May 26, 2017. (R. 60, Resp.; R. 61, Resp.) First, Plaintiff argues that Wexford's "cost-cutting measures" constitute an express policy that prevents Wexford employees from providing prisoners with referrals to specialists or other treatments. (R. 61, Resp. at 6.) Next, Plaintiff argues that his back injury qualified him as a person with a disability, and that Wexford and IDOC failed to accommodate his disability by denying him a low-bunk pass or an assistive device. (*Id.* at 11.) Last, Plaintiff argues that a bed is a "service" provided by the prison to inmates and thus requires reasonable access for inmates with a disability. (R. 60, Resp. at 6.)

## LEGAL STANDARD

"A motion to dismiss pursuant to Rule 12(b)(6) challenges the viability of a complaint by arguing that it fails to state a claim upon which relief may be granted." *Firestone Fin. Corp. v. Meyer*, 796 F.3d 822, 825 (7th Cir. 2015) (citation and internal alteration omitted). To survive a motion to dismiss, "a complaint must contain sufficient factual matter . . . to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* When considering a motion under Rule 12(b)(6), the Court must "accept as true all of the well-pleaded facts in the complaint and draw

4

all reasonable inferences in favor of [the] plaintiff." *Hill v. Serv. Emps. Int'l Union*, 850 F.3d 861, 863 (7th Cir. 2017) (citation omitted).

## ANALYSIS

### I. Count II Against Wexford

In Count II, Plaintiff alleges that Wexford's cost-cutting measures caused him to suffer severe, undiagnosed back pain for more than two years in violation of his constitutional rights. (R. 43, Second Am. Compl. ¶¶ 58-62.) Wexford moves to dismiss Plaintiff's claim under Section 1983, arguing that Plaintiff has failed to allege an express policy or a widespread practice maintained by Wexford as required under *Monell v. Department of Social Services*, 436 U.S. 658 (1978). (R. 47, Mem. at 3.)

Under *Monell*, "[l]ocal governing bodies . . . can be sued directly under § 1983 for monetary, declaratory, or injunctive relief where . . . the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." *Monell*, 436 U.S. at 690. In order for liability to attach under *Monell*, a plaintiff must allege that a local government *itself* caused or participated in the deprivation of his or her rights. *Id.* at 694. A plaintiff's *Monell* claim against a municipality is proper "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury." *League of Women Voters of Chi. v. City of Chi.*, 757 F.3d 722, 727 (7th Cir. 2014) (quoting *Monell*, 436 U.S. at 694). "There are only three ways in which a municipality can be held liable under Section 1983." *Id.* The Plaintiff must prove:

> (1) an express policy that would cause a constitutional deprivation if enforced; (2) a common practice that is so widespread and well settled that it constitutes a custom or practice; or (3) an allegation that the constitutional injury was caused by a person with final policymaking authority.

5

*Id.* While there is no heightened pleading standard for *Monell* claims, *Estate of Sims ex rel. Sims v. Cty. of Bureau*, 506 F.3d 509, 514 (7th Cir. 2007), legal conclusions and conclusory allegations are not enough to support a plausible claim, *Iqbal*, 556 U.S. at 679.

The U.S. Court of Appeals for the Seventh Circuit has extended the same analysis to Section 1983 claims against private corporations. *Shields v. Ill. Dep't of Corr.*, 746 F.3d 782, 796 (7th Cir. 2014) (explaining that the prevailing circuit case law "extends *Monell* from municipalities to private corporations."). In order to sustain a *Monell* claim against Wexford, Plaintiff must allege "that his injury was caused by a Wexford policy, custom, or practice of deliberate indifference to medical needs, or a series of bad acts that together raise the inference of such a policy." *Id.* Additionally, the policy, custom, or practice "must be the 'direct cause' or 'moving force' behind the constitutional violation." *Woodward v. Corr. Med. Serv. of Ill., Inc.*, 368 F.3d 917, 927 (7th Cir. 2004) (citation omitted).

Wexford argues that Plaintiff's *Monell* claim fails because Plaintiff does not allege an express policy or a widespread practice maintained by Wexford that violated Plaintiff's constitutional rights. (R. 47, Mem. at 5.) Wexford relies heavily on *Arita v. Wexford Health Sources, Inc.*, No. 15-cv-01173, 2016 WL 6432578 (N.D. Ill. Oct, 31, 2016), and *Taylor v. Wexford Health Sources, Inc.*, No. 15 C 5190, 2016 WL 3227310 (N.D. Ill. June 13, 2016). In *Arita*, the court granted the defendant's motion to dismiss because the plaintiff failed to allege sufficient facts establishing an express policy or a widespread practice. 2016 WL 6432578, at *3. The plaintiff's complaint contained a "single conclusory allegation" that Wexford's treatment of other inmates was similar to its treatment of the plaintiff. *Id.* Further, the plaintiff's complaint failed to establish a specific Wexford policy that may have led to improper medical care for inmates. *Id.* Similarly, in *Taylor*, while the plaintiff's complaint did include "a laundry list of ten

alleged policies maintained by Wexford," he failed to tie his injuries to a specific policy by alleging additional facts allowing the court to infer that those policies impacted the care he received. 2016 WL 3227310, at *4.

Unlike *Arita* and *Taylor*, Plaintiff's complaint does identify a specific policy that he holds responsible for his long-undiagnosed back pain: Wexford's alleged policy of cutting costs in prisoner care. (R. 43. Am. Compl. ¶ 60.) Despite his multiple requests for further care and complaints of back pain, Plaintiff alleges that Wexford and its employees denied him access to a specialist and to appropriate diagnostic testing. (*Id.* ¶¶ 59-61.) Further, Plaintiff alleges that Williams and Dr. Obaisi informed him "that they would not pay for him to see another doctor to do a job they were already doing." (*Id.* ¶ 39.) Plaintiff ties his injuries to that specific policy by alleging that he experienced severe, undiagnosed back pain for more than two years because Wexford's cost-cutting policy prevented him from seeing a specialist or receiving other treatments. (*Id.* ¶ 61.)

Wexford's cost-cutting policy allegedly denied Plaintiff timely and adequate medical treatment. (*Id.* ¶ 59.) The statement by Williams and Dr. Obaisi further supports Plaintiff's allegation that he suffered from undiagnosed back pain for more than two years because Wexford's cost-cutting measures prevented Dr. Obaisi from referring Plaintiff to a specialist or other treatments. Other courts in this District have denied similar motions to dismiss when the plaintiff alleged that adequate medical care was denied or delayed in order to cut costs. *See Harper v. Wexford Health Sources, Inc.*, No. 14-CV-04879, 2017 WL 2672299, at *3 (N.D. Ill. June 21, 2017) (denying defendant's motion to dismiss because plaintiff alleged a specific policy, namely cost-cutting measures, that resulted in plaintiff receiving inadequate medical care); *Shaw v. Obaisi*, No. 13-cv-9335, 2015 WL 638521, at *4 (N.D. Ill. Feb. 12, 2015)

7

(denying defendants' motion to dismiss because plaintiff alleged that Wexford's policies include "refusing or delaying medical treatment . . . [and] delaying or refusing to provide prescribed pain medication to lower costs"); *Watkins v. Ghosh*, No. 11 C 1880, 2011 WL 5981006, at *8 (N.D. Ill. Nov. 28, 2011) (denying defendants' motion to dismiss because plaintiff alleged that "[r]ather than referring patients who suffer from [health issues] to outside specialists, Wexford simply denies them treatment in an effort to cut costs").

Even where courts have granted such motions, this has typically been where plaintiffs have failed to tie the alleged policy to their particular injury or have failed to provide any facts beyond a bare assertion that the policy exists. *See, e.g., Taylor*, 2016 WL 3227310, at *4; *Peacock v. Rigsby*, No. 15 C 1884, 2016 WL 1383232, at *3 (N.D. Ill. Apr. 7, 2016) (finding that plaintiff's "factual allegations do not plausibly allege how a cost-cutting policy could possibly have caused his infection" and that plaintiff's claim was "speculative and implausible absent additional facts from which the Court could infer that a cost-cutting policy existed that would have impacted the kind of treatment [plaintiff] allegedly received"). Here, by contrast, Plaintiff has alleged the existence of a policy to keep costs down by denying requests for outside medical care and diagnostic tests. Rather than simply state that such a policy exists, Plaintiff also alleges that Wexford employees told him that the cost of further medical care was the reason that they would not permit him to access it. Because Plaintiff has alleged the existence of a specific cost-cutting policy that prevented him from receiving timely and adequate medical care in violation of his constitutional rights, the Court finds that he has sufficiently stated a *Monell* claim.[1]

---

[1] Because this Court finds that Plaintiff stated a *Monell* claim, the Court finds Wexford's argument that Plaintiff merely stated a *respondeat superior* claim unpersuasive. (R. 47, Mem. at 9-10.)

## II. Counts III and IV Against Wexford and IDOC

In Counts III and IV, Plaintiff alleges that Wexford and IDOC failed to reasonably accommodate his disability, resulting in his inability to access a bed in violation of the ADA and Rehabilitation Act. (*Id.* ¶¶ 72-73.) Wexford argues that Plaintiff does not allege any facts that put Wexford on notice of any violation of the ADA or the Rehabilitation Act. (R. 47, Mem. at 9.) IDOC, in turn, argues that sleeping is not an "activity" or "program" covered by the ADA or the Rehabilitation Act. (R. 54, Mem. at 5.)

Title II of the ADA provides in relevant part that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. The Act's definition of "public entity" covers instrumentalities of a State, which would include state prisons. 42 U.S.C. § 12131(1)(B); *see also Penn. Dep't of Corr. v. Yeskey*, 524 U.S. 206, 210 (1998) ("State prisons fall squarely within the statutory definition of 'public entity[.]'"). The Rehabilitation Act applies to programs receiving federal funding and contains similar antidiscrimination provisions. *See* 29 U.S.C. § 794(a), (b). Due to the similarity of the provisions and regulations implementing the ADA and the Rehabilitation Act, "courts construe and apply them in a consistent matter." *Steimel v. Wernert*, 823 F.3d 902, 909 (7th Cir. 2016) (citation and internal quotation marks omitted). "The relief available under both statutes is coextensive, thus as one claim rises or falls, so too does the other." *Clemons v. Dart*, 168 F. Supp. 3d 1060, 1065 (N.D. Ill. 2016) (citing *Jaros v. Ill. Dep't of Corr.*, 684 F.3d 667, 671 (7th Cir. 2012)).

To state a cause of action under the ADA or the Rehabilitation Act, a plaintiff must allege that (1) he is a qualified individual (2) with a disability and (3) he was denied access to a program or activity because of his disability. *Jaros*, 684 F.3d at 672. Wexford and IDOC do not

9

dispute that Plaintiff is a qualified individual with a disability, as a result of the back pain caused by his fall. (*See* R. 54, Mem. at 3-4; R. 47, Mem. at 9.) The issue then is whether Plaintiff's complaint sufficiently alleges the second and third elements—that he was denied reasonable access to programs, services, or activities provided by Stateville because of his disability.

Under the ADA and the Rehabilitation Act, "[r]efusing to make reasonable accommodations is tantamount to denying access;" although the Acts do not expressly require accommodation, "the Supreme Court has located a duty to accommodate in the statute[s] generally." *Jaros*, 684 F.3d at 672 (citation omitted). Reasonable accommodation under the relevant regulation includes "use of designs, products, or technologies as alternatives to those prescribed, provided they result in substantially equivalent or greater accessibility and usability." *Clemons*, 168 F. Supp. 3d at 1067 (emphasis omitted) (citing 36 C.F.R. § 1191, Appendix B—Americans with Disability Act: Scoping, ¶ 102.1).

Wexford argues that, because Plaintiff does not allege that he was treated differently from any other inmate based on his disability, he has not put Wexford on notice of any ADA or Rehabilitation Act claim. (R. 47, Mem. at 8-9.) Wexford fails to acknowledge, however, that failure to reasonably accommodate a disability constitutes discrimination under the ADA and Rehabilitation Act. Plaintiff alleges that his "mobility-limiting" back pain prevented him from using his top bunk. (R. 43, Second Am. Compl. ¶ 35.) Due to his inability to access his bed, Plaintiff alleges that he requested a low-bunk pass or an assistive device (such as a ladder) to reach his top bunk from Wexford and IDOC on multiple occasions. (*Id.* ¶¶ 31-32.) These requests were denied by both Wexford and IDOC. (*Id.* ¶¶ 70-71.) By Plaintiff's account, IDOC and Wexford failed to properly accommodate his disability by providing him a low-bunk pass or assistive device to allow him to reach his top bunk.

Even assuming that Plaintiff did not have reasonable access to a bunk, however, IDOC argues that neither the ADA nor the Rehabilitation Act were violated because sleeping is not an activity or program under either Act. (R. 43, Mem. at 5.) In support, IDOC relies on dicta in *Bryant v. Madigan*, 84 F.3d 246 (7th Cir. 1996), that "[s]leeping in one's cell is not a program or activity." *Id.* at 249 (internal quotation marks omitted). However, IDOC's position is not consistent with the U.S. Supreme Court's holding in *United States v. Georgia*, 546 U.S. 151 (2006), which was decided after *Bryant*. In *Georgia*, the Supreme Court held that the refusal of prison officials to accommodate a plaintiff's disability-related needs in "such fundamentals as mobility, hygiene, medical care, and virtually all other prison programs constituted exclusion from participation in or . . . denial of the benefits of the prison's services, programs, or activities." *Id.* at 157 (citation and internal alterations and quotation marks omitted). In another case decided after *Bryant*, the Supreme Court recognized that "services, programs, or activities" include recreational, medical, educational, and vocational prison programs. *Yeskey*, 524 U.S. at 210.

Relying on these Supreme Court cases, courts in this Circuit have concluded that "[p]risons must provide beds for inmates, and this is arguably a service within the meaning of the ADA and/or [Rehabilitation Act]." *Rosario v. Wexford Health Care*, No. 15-cv-1008-MJR, 2015 WL 5935244, at *3 (S.D. Ill. Oct. 13, 2015) (internal quotation marks omitted); *see also Simmons v. Ill. Dep't of Corr.*, No. 14-cv-479-JPG, 2014 WL 2159000, at *4 (S.D. Ill. May 23, 2014) (holding that "if meals and showers are considered a 'program or activity' which must be accessible to disabled inmates under the [Rehabilitation Act], then the basic need for an adequately accessible bed may also be viewed as such."). Providing a prisoner with a bed that he cannot access is no less a failure to reasonably accommodate than housing him in a cell from

which he cannot access meals. *See Johnson v. Godinez*, No. 13 CV 2045, 2015 WL 135103, at *5 (N.D. Ill. Jan. 9, 2015) (plaintiff stated a claim for failure to accommodate under the ADA and Rehabilitation Act where his disability allegedly prevented him from climbing stairs in order to go to meals). In either case, the penal institution failed to ensure that its prisoners were able to access those fundamental activities of daily living that the ADA and Rehabilitation Act seek to guarantee. Because Plaintiff sufficiently alleges that Wexford and IDOC failed to take steps that would allow Plaintiff to access a bed, either by issuing a low-bunk pass or by providing him a ladder or other assistive device, the Court finds that Plaintiff has stated a plausible claim under the ADA and Rehabilitation Act at this early stage.

## CONCLUSION

For the foregoing reasons, Wexford's (R. 46) and IDOC's (R. 53) motions to dismiss are DENIED. The parties shall appear for a status hearing on September 13, 2017, at 9:45 a.m. The parties are DIRECTED to reevaluate their settlement positions in light of this opinion and to exhaust all settlement possibilities prior to the status hearing.

ENTERED:

**Chief Judge Rubén Castillo**
**United States District Court**

**Dated: August 16, 2017**

12